**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

LAKEISHA VARNADO, individually,
and on behalf of minors, K.A.V.,
and K.E.V. and TREDONOVAN RABY,
 on behalf of minor T.R.
              Plaintiff,


          v.                                      No.    3:24-cv-133


JOSEPH CARBONI., in his personal
capacity; LORENZO COLEMAN, in his
personal capacity; TAFARI BEARD, in his
personal capacity; UNKNOWN OFFICER 1
 in his personal capacity;UNKNOWN
OFFICER 2 in his personal capacity;
CITY OF BATON ROUGE, and
PARISH OF EAST BATON
ROUGE.

              Defendants.


**COMPLAINT WITH JURY DEMAND**

   **NOW INTO COURT,** through undersigned counsel, comes Plaintiffs, Lakeisha Varnado,

INDIVIDUALLY, and on behalf of her minor children K.A.V., and K.E.V., and Tredonovan Raby,

who jointly with Lakeisha Varnado, bring suit on behalf of minor T.R., who are persons of the full

age of majority and domiciled in East Baton Rouge Parish, State of Louisiana, who respectfully

represent  the following:


**PARTIES**

  1.  Plaintiffs **LAKEISHA VARNADO** and **TREDONOVAN RABY**, are citizens of the United

       States and residents of Baton Rouge, Louisiana.

  2.  **LAKEISHA VARNADO** and **TREDONOVAN RABY** seek to jointly bring suit on behalf

Procedure as they are his parents and legal guardians.

3. **LAKEISHA VARNADO** also seeks to bring suit **individually**, and on behalf of her minor children **K.A.V.** (03/10/2006) and **K.E.V.** (D.O.B 3/03/2008) pursuant to Rule 17 of the Federal Rules of Civil Procedure as she is their mother and legal guardian.

4. Further, In February 2024, Tutorships were granted in the 19th JDC under case numbers P-114607 and P-114608 wherein **LAKEISHA VARNADO** was granted the capacity to bring suit on behalf of **K.A.V.** and **K.E.V.**

5. Moreover, Plaintiffs herein seek joinder of their claims pursuant to Rule 20 because the actions giving rise to their various injuries arise out of the same transaction and occurrence and the questions of law and fact are common to all plaintiffs in the action.

6. Made Defendants herein are:

   **JOSEPH CARBONI**, in his personal capacity; **TAFARI BEARD**, in his personal capacity; and **LORENZO COLEMAN**, in his personal capacity, and **UNKNOWN OFFICERS 1 & 2**, in their personal capacities, who are residents of Louisiana and who were employed by the Baton Rouge Police Department at the time of the events giving rise to this complaint.

7. All of these defendant officers were/are still employed by the Defendants **CITY OF BATON ROUGE** and **PARISH OF EAST BATON ROUGE** via their employment with the Baton Rouge Police Department.

8. Defendant **CITY OF BATON ROUGE** is a political subdivision of the State of Louisiana. The city's governing authority is consolidated with the government of **EAST BATON ROUGE PARISH**. Defendant **PARISH OF EAST BATON ROUGE** is a political subdivision of the State of Louisiana. The Parish's governing authority is consolidated with the government of the **CITY OF BATON ROUGE**.

**JURISDICTION AND VENUE**

9. This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of state law of Plaintiff's rights as secured by the United States Constitution, as well as the deprivation of rights under Louisiana law.

10. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367. Venue is proper under 28 U.S.C. § 1391(b), because the defendants reside in this judicial district and the events giving rise to the claims asserted herein occurred in this judicial district.

11. The holdings articulated by the Supreme Court of the United States regarding Rule 8(a)(2) of the Federal Rules of Civil Procedure are clear that all that is required for pleadings is "a short and plain statement of the claim showing that the pleader is entitled to relief" in order to "give the defendant fair notice of what the ... claim is and the grounds upon which it rests."[1]

The Supreme Court goes on in the *Iqbal* decision to state that:

> "A claim is facially plausible when the plaintiff pleads facts that allow the court to "draw the **reasonable inference** that the defendant is liable for the misconduct alleged."[2]

Further, **a court must accept all well-pleaded  facts as true and must draw all reasonable inferences in favor of the plaintiff."**[3]  Moreover, in *Caudill v. Farmland Industries,* the court defines what *reasonable inferences* are, stating: "inferences which may be drawn from the **evidence** *without resort to speculation.*"[4] However, evidence is typically not gained until the discovery phase of the litigation. Furthermore, federal courts have articulated that **courts may not apply a "heightened pleading standard"—more stringent than the usual pleading requirements of Federal Rule of Civil Procedure 8(a)—in civil rights cases alleging municipal liability under 1983.**[5] Thus, it is undersigned counsel's contention that the instant

---

[1] *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).
[2] *Iqbal* 556 U.S. at 678.
[3] *Lormand v. U. S Unwired, Inc*., 565 F. 3d 228, 232-33 (5th Cir.2009); Baker v. Putnal, 75 F, 3d 190, 196 (5th Cir.1996).
[4] *Caudill v. Farmland Industries, Inc.* 919 F.2d 83, 86 (11/15/90).
[5] *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993).

Complainants maintain that the instant petition has enough factual matter–when taken as true–for the complaint to raise a reasonable expectation that **discovery** will reveal evidence of the Defendants' unconstitutional behavior.[8]

## PLAINTIFF'S FACTUAL ALLEGATIONS

12. In the early morning hours of June 6, 2023, Ms. Lakeisha Varnado and her three minor sons were awakened by the sound of several Baton Rouge Police officers bursting into the front door and windows of their home in East Baton Rouge Parish.

13. The minor child, T.R., was in his room when "I hear 'BOOM' and someone yelling 'Baton Rouge Police Department' and the SWAT team saying 'get out with your hands up' talking on intercom, like 'everybody in 1534 [get out].'" T.R. was then instructed by an officer to "come out with [his] hands up."[9]

14. While the minor was still only in his underwear he was taken outside to the SWAT truck where an officer identified him as "an eight-year-old" minor child.

15. Simultaneously, K.E.V. attempted to exit the rear of the house believing that the family's house was being burglarized. He was subsequently detained by UNKNOWN OFFICER 1 who hit the minor child in the face with a taser before handcuffing him.

16. K.A.V., also believing that their house was being burglarized, attempted to exit the house but was tackled in the kitchen area of the home. While on the kitchen floor, an UNKNOWN

---

[6] *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929, 68 Fed. R. Serv. 3d 661 (2007).
[7] *Scheuer v. Rhodes*, 416 U.S. 232, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974) (abrogated on other grounds by, Harlow v. Fitzgerald, 457 U.S. 800, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)), Third Circuit : Havens v. Mobex Network Services, LLC, 820 F.3d 80 (3d Cir. 2016), cert. denied, 2016 WL 4944647 (U.S. 2016), Sixth Circuit: Binno v. American Bar Association, 826 F.3d 338, 333 Ed. Law Rep. 47 (6th Cir. 2016), *Eleventh Circuit: Speaker v. U.S. Dept. of Health and Human Services Centers for Disease Control and Prevention*, 623 F.3d 1371, 77 Fed. R. Serv. 3d 1059 (11th Cir. 2010), *D.C. Circuit: Williams v. District of Columbia*, 771 F. Supp. 2d 29, 268 Ed. Law Rep. 866 (D.D.C. 2011).
[8] *Supra,* note 6.
[9] Page 10, LSUHSC Department of Psychiatry, Forensic Psychiatry Division Confidential Forensic Psychological Evaluation Report.

minor without provocation.

17. Both K.E.V. and K.A.V. complained to officers on scene that these unconstitutional acts were being committed upon them. The use of force was not documented as required by BRPD policy General Order No. 135 Procedures Section I, Subsection C.

18. At the same time, 11 year old T.R., was separated from his mother, in his underwear, detained and rocking while sobbing in the back of a police vehicle."[10]

19. At this time, T.R. told a BRPD officer "I want to go to my mom" and began pointing to the car they had put his mother in.[11] The minor was "visibly distressed upon entering the vehicle, and he can be seen sobbing and hugging his mother."[12]

20. The minor, who was still unclad, was then forced to sit in the back of a BRPD unit "for an hour or two, just in [His] drawers" without being given any clothing. At this time, the minor tried speaking to his mother, but due to his level of distress (e.g., crying loudly and having difficulty breathing) he could not fully communicate with her. [13]

21. T.R. asked six times in approximately 30 minutes to use the restroom. Despite having been awakened from his sleep and showing signs of distress the minor was not allowed to relieve himself at that time.[14]

22. The minor was seated in a BRPD unit when he witnessed one of his brothers being "'got' with a taser" and began reacting to the mistreatment of his brothers by police.[15]

---

[10] Page 16, LSUHSC Department of Psychiatry, Forensic Psychiatry Division Confidential Forensic Psychological Evaluation Report.

[11] Page 10, LSUHSC Department of Psychiatry, Forensic Psychiatry Division Confidential Forensic Psychological Evaluation Report.

[12] Page 16, LSUHSC Department of Psychiatry, Forensic Psychiatry Division Confidential Forensic Psychological Evaluation Report.

[13] Page 16, LSUHSC Department of Psychiatry, Forensic Psychiatry Division Confidential Forensic Psychological Evaluation Report.

[14] Page 10-11, LSUHSC Department of Psychiatry, Forensic Psychiatry Division Confidential Forensic Psychological Evaluation Report.

[15] Page 10, LSUHSC Department of Psychiatry, Forensic Psychiatry Division Confidential Forensic Psychological Evaluation Report.

23. After hours of sitting in the police unit in only his underwear, sometime regarding his mother, T.R. was instructed by an UNKNOWN OFFICER 1 to "shut the 'h' up" and "go put clothes on." At which time, he was briefly escorted inside of his home to grab clothes before being put back into another BRPD unit.[16]

24. Soon thereafter, the minor and his family were transported by several BRPD officers, including officers Tafari Beard and Lorenzo Coleman, to the now infamous B.R.A.V.E. Cave.

25. Upon transport of the family, their house was left unlocked by BRPD officers who did not secure the home and left it open to the elements. The photos below show the state of disarray the home was left in when BRPD left it unsecured.



---

[16] Page 10, LSUHSC Department of Psychiatry, Forensic Psychiatry Division Confidential Forensic Psychological Evaluation Report.



26. After hours of sitting in the rear of police vehicles, officers transported the family to the infamous "B.R.A.V.E Cave" and despite BRPD policy requiring officers to document the date, time, and reason for using the facility and the requirement of officers to have their Body Worn Cameras on—for person searches, use of force incidents, and other law enforcement contact purposes with in the course and scope of their duties—no audio or video is available of the following horrific events.[17]

27. While in the B.R.A.V.E Cave, Ms. Varnado was separated from her children and Officer Joseph Carboni, a male, performed a Strip and Visual Body Cavity Search upon her. This encounter caused her distress and violated her constitutional rights.

28. However, one constitutional violation was not enough for Officer Carboni. Simultaneously, while at the blacksite facility, "the white man with the beard," who was later identified as Officer Joseph Carboni, was silently preying on T.R. and waiting for the right moment to strike.

29. After almost two hours of sitting in the B.R.A.V.E. Cave, T.R. asked an officer to use the restroom. At this time, Joseph Carboni intentionally took T.R. from his mother's care,

---

[17] General Order No.213 and intra-Divisional Procedure No. 502/15-1

custody and control in a separate area [at the BRAVE Cave] where T.R. and Carboni were out of sight of other adults.[18]

30. Despite T.R. having been supervised by BRPD when getting dressed at his home before being transported to the BRAVE Cave—Joseph Carboni made T.R. strip before committing a sexual battery upon him.

31. T.R. asserts that the "white dude with a beard, he told me to strip my clothes so he could search me. The white man, he told me to, and I did."[19] T.R. further asserts "that's when he started touching on me and stuff. He touched my private area like here [gestures to genitals].[20]

32. Officer Joseph Carboni then proceeded to hold the minor's penis and opened and spread the minor's buttcheeks touching his anus with his hand.[21]

33. When T.R. was taken back to his mother he immediately told her that Carboni had just conducted a body cavity search on him.[22] T.R. described a cavity search, stating that the officer "made him spread like this" and the minor gestured towards his bottom as if spreading his legs.[23]

34. Joseph Carboni sexually battered T.R. and violated his constitutional rights when he illegally conducted a strip and body cavity search on the minor child in the bathroom.

---

[18] Page 13, LSUHSC Department of Psychiatry, Forensic Psychiatry Division Confidential Forensic Psychological Evaluation Report.
[19] Page 13, LSUHSC Department of Psychiatry, Forensic Psychiatry Division Confidential Forensic Psychological Evaluation Report.
[20] Page 11, LSUHSC Department of Psychiatry, Forensic Psychiatry Division Confidential Forensic Psychological Evaluation Report.
[21] Page 13, LSUHSC Department of Psychiatry, Forensic Psychiatry Division Confidential Forensic Psychological Evaluation Report.
[22] Page 13, LSUHSC Department of Psychiatry, Forensic Psychiatry Division Confidential Forensic Psychological Evaluation Report.
[23] Page 11, LSUHSC Department of Psychiatry, Forensic Psychiatry Division Confidential Forensic Psychological Evaluation Report.

35. K.E. was also separated from his mother by the time he entered Coleman Range of was dragged into a holding cell while handcuffed. While in the cell Coleman choked and punched the child so hard that it rendered him unconscious.[24]

## A. BACKGROUND

36. Over the past several years, the now disbanded BRPD Street Crimes Unit has imposed a reign of terror upon the citizens of Baton Rouge. During a press conference on August 29, 2023, Deputy Chief Myron Daniels stated there is **nothing secretive about the facility**, which has been used for over twenty years and that as of the date of the press conference over 350 citizens had been taken to the "BRAVE Cave."

## B. "STOP AND STRIP"

### B1.  BRPD'S WRITTEN POLICY OF ILLEGAL STRIP SEARCHES

37. When the officer defendants conducted their illegal search of Ms. Varnado's private areas and T.R.'s testicles and rectum, they were acting pursuant to formal BRPD policy.

38. BRPD Policy General Order No. 281 states in pertinent part:

*III. Strip Search*

> **A.** *Arrestees will not be subjected to strip searches unless the officer has articulate, reasonable suspicion that this particular arrestee may have weapons or contraband on his person.* **Reasonable suspicion** *will be based on the following factors:*
>
> **1.** *The nature of the offense charged;*
> **2.** *The arrestee's appearance and conduct;*
> **3.** *The circumstances of the arrest.*
> **4.** *The arrestee's prior record. . . .*
>
> .   .   .   .
>
> **C.** *Strip searches may be conducted on non-arrestees based on individualized articulable reasonable suspicion to frisk . . . .*
>
> *1.  Reasonable suspicion . . . will be based on the same factors listed in III A.*

---

[24]Page 11, LSUHSC Department of Psychiatry, Forensic Psychiatry Division Confidential Forensic Psychological Evaluation Report.

39. The U.S. Supreme Court has made it unambiguously clear that law enforcement officers may conduct only a "frisk," as defined in *Minnesota v. Dickerson*, 508 U.S. 366 (1993), when officers have only reasonable suspicion of criminal wrongdoing.

40. The written BRPD policy, in place since at least 2016, violates the legal standard announced in *Minnesota v. Dickerson* for searches by police officers.



| | **BATON ROUGE POLICE DEPARTMENT** | |
|---|---|---|
| General Order No.281 | Effective Date 11-01-1994 | Revised Date 05-19-2016 |
| Subject: Search of Persons | | Reviewed 5/19/16 |

III. **Strip Search**

A. Arrestees will not be subjected to strip searches unless the officer has articulate, reasonable suspicion that this particular arrestee may have weapons or contraband on his person. Reasonable suspicion will be based on the following factors:

    1. The nature of the offense charged.
    2. The arrestee's appearance and conduct.
    3. The circumstances of the arrest.
    4. The arrestee's prior record.

B. Strip searches will be conducted under the following conditions:

    1. Strip searches of arrestees will only be conducted in either a fully enclosed room that is not accessible to the public or in a fully enclosed and secure portion of a Departmental facility or other custodial facility (e.g. Parish Prison, LSU Police Department, and Scotlandville Substation).
    2. Only the minimum number of individuals necessary to conduct the search will be present.
    3. Only officers of the same sex as the arrestee will conduct the search. The arrestee will not be touched by any officer unless it is necessary to counter resistance.

C. Strip searches may be conducted on non-arrestees based on individualized articulable reasonable suspicion to frisk, probable cause to search, consent, or a court order.

    1. Reasonable suspicion and probable cause will be based upon the same factors listed in III A.
    2. The search must be conducted in a fully enclosed room that is not accessible to the public.
    3. Only the minimum number of officers necessary to conduct the search will be present. No other persons will be present during the search.
    4. If such a location is not immediately available, the suspect may be brought to the closest departmental facility that meets the criteria set forth above.
    5. The suspect will be detained no longer than is absolutely necessary to conduct the search.
    6. Only officers of the same sex as the subject of the search will conduct the search.

## B2. BRPD'S LONG STANDING PRACTICE OR CUSTOM OF ILLEGAL STRIP SEARCHES

41. BRPD's Street Crimes Unit regularly subjects all those brought to "the BRAVE Cave" to strip searches, including non-arrestees merely suspected of criminal wrongdoing.

42. BRPD's use of the BRAVE Cave to conduct strip searches impacted a number of individuals whose detention was based solely on reasonable suspicion of wrongdoing (or less). These individuals, like 11 year old T.R., were released without formal arrest.

43. Notably, illegal strip searches were not limited to "the BRAVE Cave." BRPD officers customarily conduct strip searches on Baton Rouge residents even in public places.

44. These illegal searches have been the subject of several lawsuits with allegations spanning several years.[25]

### B3.  BRPD'S RATIFICATION OF ILLEGAL STRIP-SEARCHES BY THE FINAL POLICYMAKER

45. In 2021, BRPD officers' use of strip searches became a national news story when video of BRPD officers' (including Troy Lawrence, Jr.) strip searching Clarence Green and his juvenile brother was broadcast on *CBS Evening News*.

46. In a May 2021 press conference, BRPD's final policy maker Chief Murphy Paul and Deputy Chief Myron Daniels defended the officers' strip searches at a public conference.

47. BRPD's final policy maker Chief Murphy Paul personally cleared the officers of any wrongdoing related to the illegal strip searches depicted on the video.

48. Instead of holding the officers accountable, the City of Baton Rouge instead sought to hold in contempt the attorney, Prof. Thomas Frampton, who publicized the misconduct. However, on January 7, 2022, the court granted a preliminary injunction, finding "overwhelming evidence" that the City had acted in "bad faith and in retaliation" in its attempts to jail Professor Frampton.

49. This sent a clear message to BRPD officers: if you engage in illegal strip-searches you will **not** be punished. Instead, BRPD will seek to punish those who publicize your misconduct.

50. BRPD's final policy maker Chief Murphy Paul ensured that BRPD officers conducted strip

---

[25] Lawsuits spanning back from at least 2021, demonstrate the knowledge of City Baton Rouge, Parish of Baton Rouge, and Chief Paul of BRPD's unconstitutional Strip Search Policy. See *Green et al v. Camallo et al.*

searches consistent with General Order No. 281's instruction that "strip searches" could be based solely on an officer's suspicion of wrongdoing.

51. BRPD's final policy maker Chief Murphy Paul has since publicly admitted that the policy was unconstitutional and should not have been in place. However, despite this assertion by the Chief and countless lawsuits, the unconstitutional policy is still in place.

### C.     THE BRAVE CAVE: BRPD'S OFFICIAL BLACK SITE

52. The Street Crime Unit's use of a now-shuttered Black Site for its headquarters occurred with the express knowledge of BRPD's final policy maker Chief Murphy Paul.

53. Indeed, even after the horrors of "the Brave CAVE" became known to the public, Chief Paul announced his intention to promptly reopen the facility after "upgrades" were made.

54. In late August 2023, Chief Paul assured the public that he was confident there was no pattern of constitutional violations occurring inside "the Brave CAVE" because a network of video cameras ostensibly recorded what occurred throughout the facility.

55. At the time that he made those statements, Chief Paul and BRPD attorney Deelee Morris were aware that the cameras did not capture what occurred throughout the facility and that significant amounts of footage was "missing."

56. Also in late August 2023, Deputy Chief Myron Daniels stated that the warehouse had been in use by BRPD for at least two decades.

57. Also, Chief Paul–via public comments– stated that he had only become aware of credible allegations of serious criminal wrongdoing within "the Brave Cave" around August 2023.

58. In fact, Chief Paul was personally aware of credible allegations of serious criminal wrongdoing within "the Brave Cave" at least as early as January 2023.

59. Nevertheless, Chief Paul resisted efforts to close the torture warehouse until overwhelming public outrage, including the Mayor's insistence, compelled him to do so in September 2023.

### D.    "THE AGGRESSIVE SIDE OF US" – THE BRAVE UNIT

**60.** The fact that this family's constitutional rights were violated by a team of officers with BRPD's Street Crimes Unit—many of who are now facing criminal charges—is no surprise to anyone who has been following the turmoil caused by BRPD officers for the last few years.

**61.** Describing the Street Crimes Unit during a 2019 interview, now-indicted Deputy Chief Troy Lawrence, Sr. called the unit: "the aggressive side of us," referring to BRPD.

**62.** According to Chief Paul, now-arrested Deputy Chief Troy Lawrence, Sr. personally intervened to ensure that his now-arrested son, Troy Lawrence, Jr., was transferred to the Street Crimes Unit. But Troy Lawrence, Jr. was ostensibly part of a special program for high-risk officers with a documented history of violence and misconduct that Chief Paul was personally involved in overseeing; indeed, he was the *only* BRPD officer who was part of this program in 2023. Chief Paul knew this and approved of the transfer of Troy Lawrence, Jr. to the Street Crimes Unit anyway.[26]

**63.** The transfer—in lieu of meaningful reprimand—of violent and lawless officers like Troy Lawrence Jr. is just one example of the way BRPD leadership, and the Chief in particular, fostered an "anything goes" attitude with the Street Crimes Unit. Indeed, Chief Paul displayed deliberate indifference to repeated Fourth Amendment violations by members of the Street Crimes Unit.

### E.    BRPD'S HISTORY OF USE OF EXCESSIVE FORCE

**64.** BRPD agreed to a $350,000 settlement related to BRPD officer Lorenzo Coleman's use of excessive force in 2008.

**65.** In 2021, The Baton Rouge Metropolitan Council approved a $4.5 million dollar settlement

---

[26] See, https://www.wafb.com/2023/04/21/brpd-officer-son-deputy-chief-has-history-complaints/ news segment published by WAFB on April 20, 2023.

interaction, which led to the claim of excessive force.

66. The Baton Rouge Metropolitan Council  recently approved a \$1.17 million settlement, for Plaintiff Blair Imani and other protestors who brought a lawsuit against the City and BRPD for use of excessive force in 2016.[27]

67. Plaintiff Raheem Howard brought a lawsuit against BRPD for several claims including use of excessive force for an incident which occurred in 2018.[28]

68. A 2007 arrest on a complaint of "loud music" with pepper spray and force that caused the rupture of the arrestee's bladder.

69. A 2008 arrest for smoking marijuana that fractured the skull of the arrestee causing internal bleeding and permanent brain damage.

70. A 2011 incident in which an officer instructed a man, who advised the officer he was intoxicated, to move a vehicle away from the scene of the arrest; when the drunk driver crashed the car, the officer shot him to death and shot a bystander in the arm.

71. A 2014 incident in which BRPD officers strip-searched a visitor to a home which was being searched by the officers, then kicked the visitor with such force that his head slammed into the floor, knocking several teeth out of his mouth.

72. A 2015 incident in which two members of the news media were handcuffed, and one arrested, for taking pictures of an arrest.

73. A 2016 incident caught on video in which a sixteen-year-old was held down by multiple officers while one officer repeatedly punched him in the head.[29]

74. In recent years, suits against the City/Parish for BRPD's excessive uses of force and unconstitutional arrests have resulted in sizeable yearly settlements by the Parish Attorney.

---

[27] *Imani et al v. City of Baton Rouge,* et al, 3:17-cv-00439, Middle District of Louisiana.

[28] *Howard v. The City of Baton Rouge*, et al., 3:19-cv-00079, Middle District of Louisiana.

[29] Jarvis DeBerry, Before killing Alton Sterling, Baton Rouge police had a history of brutality complaints, The Times-Picayune, July 6, 2016.

For example, the City/Parish paid $372,434 to settle such claims in 2015; $58,282 in 2014; and $437,112 in 2011.

75. A 2020 incident whereby Officer Troy Lawrence, Jr., also used force and violence against motorist, Shermanie Reed, who (correctly) told him he was acting unprofessionally. BRPD officers then grossly misrepresented the details of the encounter in a police report.

76. A 2023 incident whereby BRPD officers Troy Lawerence, Jr., Matthew Wallace, and Joseph Carboni committed battery upon Jeremy Lee while in the B.R.A.V.E. Cave fracturing his ribs and causing a contusion to his head.

## F.  RATIFICATION OF EXCESSIVE FORCE AND FAILURE TO REPORT EXCESSIVE FORCE BY THE FINAL POLICYMAKER

77. Plaintiffs incorporate the allegations in each preceding and following paragraph.

78. The misconduct described above was caused by the policies, practices, and customs of Policymaker Defendants.

79. The above-described widespread practices, which were so well settled as to constitute the *de facto* policy of the Defendants, were allowed to exist because policymakers with authority over these acts exhibited deliberate indifference to the problem, thereby effectively ratifying it.

80. This is clear from the history of Defendant's and BRPD's use of force described above that the policies, practices, and customs set forth above were the driving impetuses behind the numerous constitutional violations in this case that directly and proximately caused Plaintiffs to suffer the grievous and permanent injuries and damages set forth below.

81. Defendants named in this Count, acting individually and together, under color of law, acted to violate Plaintiffs' rights as set forth in the preceding claims. Policymaker Defendants have developed and maintained policies, practices, procedures, customs, and usages exhibiting deliberate indifference to the constitutional rights of citizens and residents of the City/Parish,

usages described above, which caused the violation of Plaintiffs' rights as described herein and the resultant damages suffered.

82. Policymaker Defendants had the power to prevent or aid in the prevention of the wrongs done and conspired to be done as described herein, yet failed or refused to do so, in violation of 42 U.S.C. § 1983.

83. The actions of the Defendants were the direct and proximate cause of the violations of Plaintiffs' Fourth and Fourteenth Amendment rights, bodily injury, pain, suffering, mental distress, anguish, humiliation, loss of liberty, loss of income, and legal expenses, as set forth more fully below.

84. Moreover, the actions of all Defendants were directed, condoned, and/or ratified by Policymaker Defendants.

## CAUSES OF ACTION

### COUNT I
**Violation of 42 U.S.C. § 1983: Unreasonable Seizure (Fourth Amendment)**
**(PLAINTIFF'S AGAINST JOSEPH CARBONI, LORENZO COLEMAN, TAFARI BEARD, MURPHY PAUL, UNKNOWN OFFICER 1, UNKNOWN OFFICER 2)**

85. Plaintiff repeats and realleges all of the paragraphs in this complaint as if fully set forth herein.

86. The decision to take 11 year old T.R. to "the BRAVE Cave" and to continue holding him there for hours was unreasonable and in clear violation of the minors constitutional rights.

87. As a direct and proximate result of this deprivation of his constitutional right to be free from unreasonable searches, Plaintiff suffered emotional injuries.

**COUNT II**
**42 U.S.C. § 1983: Unreasonable Search (Fourth Amendment)**
**(PLAINTIFF'S LAKEISHA VARNADOA AND T.R. AGAINST JOSEPH CARBONI)**

88. Plaintiff repeats and realleges all of the paragraphs in this complaint as if fully set forth herein.

89. As more fully described above, Defendant JOSEPH CARBONI unreasonably searched Ms. Varnado and her 11 year old son  when he performed a strip and visual body cavity search of Ms. Varnado and her 11 year old son and and in clear violation of their constitutional rights.

90. As a direct and proximate result of this deprivation of their constitutional right to be free from unreasonable searches, Plaintiffs suffered injuries.

**COUNT III**
**42 U.S.C. § 1983: Failure to Intervene**
**(PLAINTIFF'S AGAINST TAFARI BEARD)**

91. Plaintiff repeats and realleges all of the paragraphs in this complaint as if fully set forth herein.

92. "[A]n officer who is present at the scene and does not take reasonable measures to protect a suspect from another officer's use of excessive force may be liable under section 1983." *Hale v. Townley*, 45 F.3d 914, 919 (5th Cir. 1995) (citations omitted). "[A]n officer may be liable under § 1983 under [this] theory of bystander liability where the officer '(1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act.' " *Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013) (citations omitted).

93. The defendant Officers, Lorenzo Coleman and Tafari Beard observed their fellow officers violating the Plaintiffs' constitutional rights, had a reasonable opportunity to intervene, and chose not to act.

94. The actions and inactions of the Defendants were the direct and proximate cause of the violations of Plaintiffs' Fourth Amendment rights, bodily injury, pain, suffering, mental distress, anguish, humiliation, and loss of liberty.

## COUNTS V and VI
### *Monell* Liability for Counts I and II
**(PLAINTIFF'S AGAINST CITY OF BATON ROUGE, PARISH OF EAST BATON ROUGE)**

95. Plaintiff repeats and realleges all of the paragraphs in this complaint as if fully set forth herein against BRPD and all municipal defendants.

96. A Monell claim against a municipality can be established in at least eight different theories: (1) An express policy; (2) A violation by the final policymaker; (3) Improper hiring practices; (4) Improper retention practices; (5) Improper supervision/discipline; (6) Deficient training; (7) Pattern of misconduct; or (8) Ratification by final policymaker.

97. A government entity and responsible officials can be held liable for the retention of officers who cause constitutional violations when a plaintiff can demonstrate "deliberate indifference" to the "known or obvious consequence[s]" of such retention decisions. See Gomez v. Galman, 18 F. 4th 769, 778 (5th Cir. 2021), citing Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown, 520 U.S. 397, 410 (1997).

98. Deliberate indifference exists "where adequate scrutiny of an applicant's background would lead a reasonable supervisor to conclude that the plainly obvious consequences of the decision to [retain] would be the deprivation of a third party's constitutional rights." Gomez, supra, citing Gros v. City of Grand Prairie, 209 F.3d 431, 433-34 (5th Cir. 2000) (citing Snyder v. Trepagnier, 142 F.3d 791, 797 (5th Cir. 1998)).

99. Here, Plaintiffs bring a Monell claim under theories 1, 4, 5, 6, 7 and 8:

> **1.** The express policy being the unconstitutional BRPD search policy;
> **4.** Improper retention practices (the choice by BRPD to retain officers like Tafari Beard, Lorenzo Coleman, and Joseph Carboni and others despite history of repeated misconduct and violence);

improper Supervision/Discipline (the complete breakdown of accountability at BRPD);

**6.** Deficient training (the failure to meaningfully train officers on constitutional search practices and policing);

**7.** Pattern of misconduct (the hundreds or thousands of Baton Rouge citizens abused on the streets and at the law enforcement black sites in a manner similar to Plaintiffs); and

**8.** Chief Paul as the final policy maker ratified the actions of his officers by failing to amend BRPD's unconstitutional strip search policy and by failing to train or supervise officers who the department knew violated citizens constitutional rights.

**100.** As to Monell theory number "1," the Plaintiff further alleges that BRPD maintains and implements formal written policies authorizing illegal strip-searches predicated on "reasonable suspicion" that caused the constitutional violations alleged in this complaint.

**101.** As to Monell theories "4" through "8," Plaintiffs further allege that there is a pattern, practice, custom, and informal policy of false arrests, unlawful seizures, **excessive force** and **unconstitutional searches**; and that this widespread recurring practice is so prevalent and settled that it constitutes formal policy; and that adherence to that practice caused the constitutional violations at issue in this complaint. Some examples being:

    **I.** *Percle v. City of Baton Rouge et al.,* where, following a trial by jury, on March 10, 2016, the jury rendered a verdict in favor of the plaintiff for an officers' use of excessive force, in violation of the Fourth Amendment; the jury further found that **BRPD officer Jason Acre was liable for conducting a strip search of Percle** in violation of the Fourth Amendment to the United States Constitution; *and* found **that a moving force behind the unconstitutional strip search of Percle was a custom or policy of defendant the City of Baton Rouge, of which the City of Baton Rouge knew or should have known and was deliberately indifferent.** The jury further found that defendants Moruzzi and Acre caused Percle damages in the amount of $25,000.00. Moreover, the jury found that the City of Baton Rouge was vicariously liable as a matter of law for the Louisiana state law torts.

Two months after this jury award, as illustrated above, on or about May 19, 2016, BRPD revised its Strip Search Policy. Despite the appearance of changing the policy, BRPD actually codified its already long-standing custom of unconstitutional strip searches. Given the 2016 jury award and 1993 case law in *Minnesota v. Dickerson*, The City of Baton Rouge/ Parish of East Baton Rouge and the Baton Rouge Police Department were on notice since at least 2016 of its custom and

policy of unconstitutional strip searches. This continuation of their custom and policy of unconstitutional strip searches represent callous indifference on the part of the City and the Department.

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **BRETT PERCLE** | * | **CIVIL ACTION NO.: 14-449-SDD-RLB** |
| | * | |
| **VERSUS** | * | |
| | * | |
| **THE CITY OF BATON ROUGE, ET AL.** | * | |
| | * | |

### JUDGMENT

This matter came before the Court for a trial by jury beginning March 7, 2016. On March 10, 2016, the jury rendered its verdict finding defendant Robert Moruzzi liable for using excessive force against plaintiff, Brett Percle, in violation of the Fourth Amendment to the United States Constitution; finding Moruzzi liable for committing an assault and battery against Percle, as defined by Louisiana law; finding defendant Jason Acree liable for conducting a strip search of Percle in violation of the Fourth Amendment to the United States Constitution; and finding that a moving force behind Acree's strip search of Percle was a custom or policy of defendant the City of Baton Rouge, of which the City of Baton Rouge knew or should have known and was deliberately indifferent.

The jury further found that defendants Moruzzi and Acree caused Percle damages in the amount of $25,000.00.

The City of Baton Rouge is further vicariously liable as a matter of law for the Louisiana state law torts committed by Moruzzi, as found by the jury.

Accordingly,

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that Judgment is rendered in favor of plaintiff, Brett Percle, and against defendants, The City of Baton Rouge, Jason Acree, and Robert Moruzzi, jointly, severally, and in solido, in the principal amount of

1

violations by subjecting them to unreasonable seizure, illegal search of the couple's residence, and an illegal search of Mr. Green's persons.

**III.** *Mealy et al v. City of Baton Rouge et al*, whereby the Plaintiffs allege fourth amendment violations for unreasonable searches and seizures which included several illegal strip and body cavity searches.

**IV.** *Hardnett v. City of Baton Rouge, et al*, whereby the Plaintiff alleges fourth amendment violations by Baton Rouge Police Department for having maintained a policy and/ or practice of strip-searching individuals taken into their custody, without probable cause and without individualized reasonable suspicion that the individuals were secreting weapons or drugs.

**V.** *Tennart et al. vs. City of Baton Rouge et al.*, whereby the Plaintiff alleges fourth and fourteenth amendment violations by Baton Rouge Police Department for false detention, arrest, and imprisonment.[30]

**102.** Plaintiff further alleges that JOSEPH CARBONI was inadequately trained regarding Fourth Amendment seizures and searches; that this inadequate training caused Plaintiffs' constitutional injuries; and that BRPD and the City-Parish were deliberately indifferent to the constitutional rights injured.

---

[30] *Tennart et al. vs. City of Baton Rouge et al,* 3:17-cv-00179. Section 62 of the Plaintiff's original complaint also cites multiple lawsuits against the Baton Rouge Police department whereby BRPD was placed on notice of their policy, practice and custom of excessive uses of force and illegal searches. Those cases "included: (a) a 2007 arrest on a complaint of "loud music" with pepper spray and force that caused the rupture of the arrestee's bladder; (b) a 2008 arrest for smoking marijuana that fractured the skull of the arrestee, causing internal bleeding and permanent brain damage; (c) a 2011 incident in which an officer instructed a man, who advised the officer he was intoxicated, to move a vehicle away from the scene of the arrest; when the drunk driver crashed the car, the officer shot him to death and shot a bystander in the arm; (d) a 2014 incident in which BRPD officers strip-searched a visitor to a home which was being searched by the officers, then kicked the visitor with such force that his head slammed into the floor, knocking several teeth out of his mouth; (e) a 2015 incident in which two members of the news media were handcuffed, and one arrested, for taking pictures of an arrest; (f) a 2016 incident in which a sixteen-year-old was held down by multiple officers while one officer repeatedly punched him in the head; and (g) the shooting death of Alton Sterling in July 2016."

103.    Plaintiff further alleges that COLEMAN, BEARD, CARBONI and UNKNOWN

OFFICER 1-2 were inadequately supervised; that this inadequate supervision caused

Plaintiff's constitutional injuries; and that BRPD and the City-Parish were deliberately

indifferent to the constitutional rights injured.

104.    Plaintiff further alleges that COLEMAN, BEARD, CARBONI and UNKNOWN

OFFICERS 1-2 were inadequately disciplined; that this inadequate discipline caused

Plaintiff's constitutional injuries; and that BRPD and the City-Parish were deliberately

indifferent to the constitutional rights injured.

105.    Plaintiff further alleges that the conduct of COLEMAN, BEARD, CARBONI, and

UNKNOWN OFFICERS 1-2 was authorized, approved, and ratified by BRPD's final policy

maker Chief Murphy Paul, who wields final policymaking authority for BRPD in the

relevant fields.

### COUNT VII
### *Monell* Liability for Excessive Use of Force
### (PLAINTIFF'S AGAINST CITY OF BATON ROUGE, PARISH OF EAST BATON ROUGE)

106.    Plaintiff repeats and realleges all of the paragraphs in this complaint as if fully set forth

herein against BRPD and all municipal defendants.

107.    A Monell claim against a municipality can be established in at least eight different

theories: (1) An express policy; (2) A violation by the final policymaker; (3) Improper hiring

practices; (4) Improper retention practices; (5) Improper supervision/discipline; (6) Deficient

training; (7) Pattern of misconduct; or (8) Ratification by final policymaker.

108.    A government entity and responsible officials can be held liable for the retention of

officers who cause constitutional violations when a plaintiff can demonstrate "deliberate

indifference" to the "known or obvious consequence[s]" of such retention decisions. See

Gomez v. Galman, 18 F. 4th 769, 778 (5th Cir. 2021), citing Bd. of Cnty. Comm'rs of Bryan

Cnty. v. Brown, 520 U.S. 397, 410 (1997).

**109.** "Deliberate indifference exists where inadequate scrutiny of an applicant's background would lead a reasonable supervisor to conclude that the plainly obvious consequences of the decision to [retain] would be the deprivation of a third party's constitutional rights." Gomez, supra, citing Gros v. City of Grand Prairie, 209 F.3d 431, 433-34 (5th Cir. 2000) (citing Snyder v. Trepagnier, 142 F.3d 791, 797 (5th Cir. 1998)).

**110.** Here, Plaintiffs bring a *Monell* claim under theories 4, 5, 6, 7 and 8:

> **4.** Improper retention practices (the choice by BRPD to retain officers like Lorenzo Coleman and others despite history of repeated misconduct and violence);
> **5.** Improper supervision/discipline (the complete breakdown of accountability at BRPD);
> **6.** Deficient training (the failure to meaningfully train officers on constitutional search practices and policing);
> **7.** Pattern of misconduct (the hundreds or thousands of Baton Rouge citizens abused on the streets and at the law enforcement black sites in a manner similar to Plaintiffs); and
> **8.** Chief Paul as the final policy maker ratified the actions of his officers by failing to amend BRPD's unconstitutional strip search policy and by failing to train or supervise officers who the department knew violated citizens constitutional rights.

**111.** As to Monell theories "4" through "8," Plaintiffs further allege that there is a pattern, practice, custom, and informal policy of false arrests, unlawful seizures, **excessive force** and **unconstitutional searches**; and that this widespread recurring practice is so prevalent and settled that it constitutes formal policy; and that adherence to that practice caused the constitutional violations at issue in this complaint. Some examples being:

> **I.** BRPD agreed to a $350,000 settlement related to BRPD officer Lorenzo Coleman's use of excessive force in 2008.
> **II.** In 2021, The Baton Rouge Metropolitan Council approved a $4.5 million dollar settlement for the family of Alton Sterling, whom a BRPD officer shot and killed during a routine interaction, which led to the claim of excessive force.
> **III.** The Baton Rouge Metropolitan Council recently approved a $1.17 million settlement, for Plaintiff Blair Imani other and protestors who brought a lawsuit against the City and BRPD for use of excessive force in 2016.[31]
> **IV.** Plaintiff Raheem Howard brought a lawsuit against BRPD for several claims including use of excessive force for an incident which occurred in 2018.[32]

---

[31] *Imani et al v. City of Baton Rouge,* et al, 3:17-cv-00439, Middle District of Louisiana.
[32] *Howard v. The City of Baton Rouge*, et al., 3:19-cv-00079, Middle District of Louisiana.

force that caused the rupture of the arrestee's bladder.

VI.    A 2008 arrest for smoking marijuana that fractured the skull of the arrestee causing internal bleeding and permanent brain damage.

VII.    A 2011 incident in which an officer instructed a man, who advised the officer he was intoxicated, to move a vehicle away from the scene of the arrest; when the drunk driver crashed the car, the officer shot him to death and shot a bystander in the arm.

VIII.    A 2014 incident in which BRPD officers strip-searched a visitor to a home which was being searched by the officers, then kicked the visitor with such force that his head slammed into the floor, knocking several teeth out of his mouth.

IX.    A 2015 incident in which two members of the news media were handcuffed, and one arrested, for taking pictures of an arrest.

X.    A 2016 incident caught on video in which a sixteen-year-old was held down by multiple officers while one officer repeatedly punched him in the head.[33]

XI.    In recent years, suits against the City/Parish for BRPD's excessive uses of force and unconstitutional arrests have resulted in sizeable yearly settlements by the Parish Attorney. For example, the City/Parish paid $372,434 to settle such cases in 2015, $581,286 in 2014, and $437,112 in 2011.

XII.    A 2020 incident whereby Officer Troy Lawrence, Jr., also used force and violence against motorist, Shermanie Reed, who (correctly) told him he was acting unprofessionally. BRPD officers then grossly misrepresented the details of the encounter in a police report.

XIII.    A 2023 incident whereby BRPD officers Troy Lawerence, Jr., Matthew Wallace, and Joseph Carboni committed battery upon Jeremy Lee while in the B.R.A.V.E. Cave fracturing his ribs and causing a contusion to his head.

**COUNT VIII**
**Federal Constitutional Claims**
**Violation of 42 U.S.C. § 1983:**
**Failure to Train, Supervise, and Discipline its Officers**
**(PLAINTIFF'S AGAINST CITY OF BATON ROUGE, PARISH OF EAST BATON ROUGE)**

112.    Plaintiff maintains that the City of Baton Rouge, the Parish of East Baton Rouge and Chief Paul have failed to supervise and discipline BRPD officers when they violate a person's constitutional rights. As illustrated above, BRPD officers have a long history of violating these rights. Further illustrative of the government's failure to supervise and discipline its deputies for violations of persons constitutional rights, is the fact that despite

---

[33] Jarvis DeBerry, Before killing Alton Sterling, Baton Rouge police had a history of brutality complaints, The Times-Picayune, July 6, 2016.

complaints filed by several citizens against members of the Street Crimes unit in 2023, the department did not discipline those officers for direct violations of department policy as it relates to the Baton Rouge Police Department Policy and Procedure Manual:

    **A.** General Order No. 106
    **B.** General Order No. 107 Law Enforcement Code of Ethics/ Oath of Office;
    **C.** General Order No. 108 Bias Based Profiling;
    **D.** General Order No. 112
        ● 3:19;
        ● 3:22;
        ● 3:23;
    **E.** General Order No. 131;[34]
    **F.** General Order No. 135;
    **G.** General Order No. 135.1;
    **H.** General Order No. 213- Departmental Temporary Detention Facilities;
    **I.** General Order No. 271;
    **J.** General Order No. 281;
    **K.** Intra Divisional Procedure 502/15-1

**113.** Moreover, Plaintiff maintains that the City of Baton Rouge, the Parish of East Baton Rouge and Chief Paul failed to supervise and discipline BRPD officers when they violated a departmental policy. Specifically, BRPD Policy Manual General Order No. 108[35] thereby creating a pattern and practice of racial discrimination. District 10 (where BRPD First District and the B.R.A.V.E. Cave are located) is 57.82% Black and 34.61% White.[36]

---

[34] **General Order No. 131**– Procedures– III. Use of Deadly Force–C. A report shall be submitted whenever an employee takes an action that results in (or is alleged to have resulted in) injury or death of another person.

[35] POLICY— The purpose of this policy is to unequivocally state that bias-based profiling in law enforcement is totally unacceptable, to provide guidelines for officers to prevent such occurrences, and to protect our officers when they act within the dictates of the law and policy from unwarranted accusations. It is the policy of this department to patrol in a proactive manner, to investigate suspicious persons and circumstances, and to enforce the motor vehicle laws. In so doing, officers will only stop or detain citizens when there exists reasonable suspicion to believe they have committed, are committing, or are about to commit, an infraction of the law.

DEFINITIONS — Bias based profiling: The detention, interdiction, or other disparate treatment of individuals based solely on a common trait of a group. This includes race, ethnic background, gender, sexual orientation, economic status, age, cultural background or any other identifiable group

Reasonable suspicion: Suspicion that is more than a mere hunch. It is based on a set of facts and circumstances that would cause a reasonable person to believe that an infraction of the law has been committed, is about to be committed, or is in the process of being committed, by the person or persons under suspicion. This can be based on the observations of a police officer combined with his or her training and experience, and/or reliable information received from credible outside sources.

PROCEDURES — 1. Standards – A.All investigative detentions, traffic stops, arrests, searches and seizures or forfeitures of property by officers will be based on a standard of reasonable suspicion Or probable cause. Any action taken will not be based on face, ethnic background, gender, sexual orientation, economic status, age, cultural background, or any other identifiable group characteristic.     B. Officers must be able to articulate specific facts, circumstances and conclusions which support probable cause or reasonable suspicion for an arrest, traffic stop or investigative detention.     C.Officers may take into account the reported race, ethnicity or national origin of a specific suspect that links a person to a particular criminal incident or links a specific series of crimes to a group of individuals of a particular race/ethnicity.

[36] https://www.brla.gov/801/District-Map-Demographics.

**2020 Census Data for Baton Rouge by District and Race**[37]

| District | Members | White | Black | Other | Total |
|----------|---------|-------|-------|-------|-------|
| District 1 | Brandon Noel | 51.57% | 41.99% | 6.43% | 40,702 |
| District 2 | Chauna Banks | 10.91% | 85.29% | 3.80% | 31,267 |
| District 3 | Rowdy Gaudet | 56.66% | 24.11% | 19.22% | 45,381 |
| District 4 | Aaron Moak | 60.15% | 25.38% | 14.47% | 38,602 |
| District 5 | Erika L. Green | 4.79% | 89.65% | 5.55% | 34,277 |
| District 6 | Cleve Dunn Jr. | 20.98% | 64.97% | 14.04% | 34,541 |
| District 7 | LaMont Cole | 22.01% | 72.51% | 5.48% | 33,966 |
| District 8 | Denise Amoroso | 43.96% | 37.54% | 18.49% | 38,229 |
| District 9 | Dwight Hudson | 63.19% | 20.96% | 15.85% | 42,402 |
| District 10 | Carolyn Coleman | 34.61% | 57.82% | 7.58% | 37,492 |
| District 11 | Laurie Adams | 63.47% | 22.98% | 13.54% | 40,805 |
| District 12 | Jennifer Racca | 61.07% | 25.78% | 13.15% | 39,117 |
| **Total** | **N/A** | **N/A** | **N/A** | **N/A** | **456,781** |

114.    As stated above, evidence of the city, parish and Chief's notice of this pattern and practice of racial discrimination was given by  Deputy Chief  Myron Daniels in 2023 when he stated the facility had been used for over twenty years. Based on knowledge, information, and belief, undersigned counsel maintains that the overwhelming majority of the individuals taken to the secretive location were African American. This is a clear disparity, because the people detained, arrested and taken to the BRAVE cave is not consistent with the racial composition of the district patrolled by the Street Crimes Unit in District 10.  Thus, the city/parish government knew of the violation of General Order No. 108.

115.    The above instances illustrate that the defendants have a pattern and practice of failing to supervise its officers when they fail to discipline them for violating a person's constitutional rights and for violating departmental policies.

---

[37] https://www.brla.gov/801/District-Map-Demographics.

**Counts IX, X, XI, and XII.**
**State Law Claims: Battery, Assault, Intentional Infliction of Emotional Distress, Negligence.**
**(PLAINTIFF'S AGAINST JOSEPH CARBONI, LORENZO COLEMAN, TAFARI BEARD,**
**MURPHY PAUL, UNKNOWN OFFICER 1, UNKNOWN  OFFICER 2, PARISH OF EAST**
**BATON ROUGE, CITY OF BATON ROUGE)**

116.    Plaintiff repeats and realleges all of the paragraphs in this complaint as if fully set forth

herein.

117.    As more fully described above, all defendants (including the City of Baton Rouge, and

East Baton Rouge Parish) are responsible and liable to Ms. Varnado, T.R., K.E.V., and

K.A.V. for the damages and injuries the Plaintiff has suffered as a result of Defendants'

actions and/or inactions pursuant to the following:

A. Louisiana Code of Civil Procedure Article 2315, which provides that "[e]very act
   whatever of man that causes damage to another obliges him by whose fault it
   happened to repair  it;"
B. Louisiana Code of Civil Procedure Article 2316, which provides that "[e]very
   person is responsible for the damage he occasions  not merely by his act, but by
   his negligence, his imprudence, or his want of skill;"
C. Louisiana Code of Civil Procedure Article 2317, which provides that "[w]e are
   responsible, not only for the damage occasioned by our own act, but  for that
   which is caused by the act of persons for whom we are answerable, or of the things
   which  we have in our custody;" and
D. Louisiana Code of Civil Procedure Article 2320, which provides that "[m]asters
   and employers are  answerable for the damage occasioned by their servants and
   overseers,    in    the    exercise    of    the    functions    in    which    they    are
   employed…responsibility only attaches, when the masters or employers…might
   have prevented the act which caused the damage, and have not done it."

118.    **Battery** - "[a] harmful or offensive contact with a person, resulting from an act intended

to cause the plaintiff to suffer such a contact[.][38]

In the instant case, officers with the Baton Rouge Police Department, in their official

capacity as officers employed by BRPD, initiated contact with Ms. Varnado, T.R., K.E.V., and

K.A.V. when executing a search warrant upon their residence. Upon contact one minor was hit

---

[38] *Cage v. Wood*, 484 So.2d 850 (La.App. 1st Cir.1986); *Ross v. Sheriff of Lafourche Parish*, 479 So.2d 506 (La.App. 1st
Cir.1985); *Vascocu v. Singletary*, 404 So.2d 301 (La.App. 3d Cir.1981); *Ashland Oil, Inc. v. Miller Oil Purchasing Co.*, 678 F.2d
1293 (5th Cir.1982); Restatement (Second) of Torts, American Law Institute § 13 (1965); F. Stone, Louisiana Civil Law Treatise,
Tort Doctrine § 124—130 (1977); W. Prosser and W. Keeton, The Law of Torts, § 9 (5th ed. 1984); F. Harper and F. James, The
Law of Torts, § 3.1—3.3 (2nd ed. 1986).

with a taser by a unknown BRPD Officer and another was held in a face while still in the home. The family was then subsequently taken to the "BRAVE Cave" where T.R. and Ms. Varnado were subjected to unconstitutional Strip and Body Cavity searches that included offensive contact by at least one BRPD officer who sexually battered T.R. and touched his genital area.

K.E.V was also subsequently taken to the "BRAVE Cave" where Lt. Lorenzo Coleman choked the juvenile and knocked him unconscious, thereby committing the act of battery upon the minor.

119. **Assault** - 'a threat of such a harmful or offensive contact."[39]

In the instant matter, an assault occurred when Ms. Varnado, and T.R. were detained by BRPD officers, transported to the "BRAVE Cave", and forcibly subjected to an offensive, unwarranted, and invasive search of their person. A second assault occurred when a BRPD officer threatened to call Child Protective Services (and essentially take the minor from his parents) if T.R. could not quickly make contact with his father. All the above listed instances were assaults as they placed Ms. Varnado and T.R. in apprehension of receiving further injury at the hands of BRPD Officers..

120. **Intentional infliction of emotional distress-** "the Louisiana Supreme Court has outlined the three elements a plaintiff must establish in order to bring a claim for intentional infliction of emotional distress: 1) extreme and outrageous conduct by the defendant; 2) severe emotional distress suffered by the plaintiff; and 3) the intent by the defendant to inflict severe emotional distress or the knowledge that severe emotional distress was certain or substantially certain to result from the defendant's conduct."[40]

In the instant case, extreme and outrageous conduct was exhibited by BRPD officers,

---

[39] *See* 512 So. 2d 389 (La. 1987).
[40] *White v. Monsanto Co.*, 585 So.2d 1205, (La. 1991); *Karl J. Pizzalotto, M.D., Ltd. v. Wilson*, 437 So.2d 859 (La.1983); *Coppage v. Gamble*, 324 So.2d 21 (La.App. 2d Cir.1975); F. Stone, Louisiana Civil Law Treatise, Tort Doctrine, § 125—127 (1977); F. Harper and F. James, The Law of Torts, § 3.3 (2nd ed. 1986). Cause of action for intentional infliction of emotional distress is viable in Louisiana, generally in accord with legal precepts set forth in Restatement (Second) of Torts. LSA-C.C. art. 2315.

which caused the intentional infliction of emotional distress upon the Plaintiffs when Ms. Varnado, T.R., K.E.V., and K.A.V. were detained and subjected to unconstitutional strip and body cavity searches, battered, choked and knocked unconscious by BRPD officers.

121.    **Negligence**– In order to prevail in a negligence action, a plaintiff must prove the following five elements:  (1) the defendant had a duty to conform his conduct to a specific standard of care; (2) the defendant's conduct failed to conform to the appropriate standard of care [breach of duty]; (3) the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries; (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries; and (5) the plaintiff was damaged.[41]

In the instant matter, the Defendant officers had a duty to conform their conduct to a specific standard of care, i.e., respect for Plaintiff's constitutional rights. Chief Paul, BRPD, and the municipal defendants likewise had a duty to do so. Moreover, the substandard conduct of the defendants directly led to and was the cause-in-fact of the Plaintiff's various injuries. Therefore, the officer's breach of duty was the legal cause of the Plaintiff's injuries and the cause of his damages.

122.    No reasonably prudent officer would have initiated or prolonged the illegal seizure of Ms. Varnado, T.R., K.E.V., and K.A.V.

123.    No reasonably prudent officer would initiate an unwarranted strip and body cavity search of the minor T.R and his mother Ms. Varnado.

124.    No reasonably prudent officer would initiate or carry out violations of citizens constitutional rights.

125.    Moreover, defendants COLEMAN, BEARD, CARBONI, UNKNOWN OFFICERS 1-2 all had knowledge that severe emotional distress was substantially certain to result from their

---

[41] *Fruge v. ONOB, Inc.*, Court of Appeal of Louisiana, Third Circuit, 32 So.3d 1115.

126.    As a result of the abovementioned torts, the Varnado/Raby family has suffered damages

including: (1) deprivation of their right to be free from unreasonable searches and seizures;

(2) mental and emotional injury; (3) pain and suffering; and (4) any other special and general

damages and expenses, in an amount to be proven at trial.


### Counts XIII and XIV
### State Constitutional Violations
**(PLAINTIFF'S AGAINST JOSEPH CARBONI, LORENZO COLEMAN, TAFARI BEARD, MURPHY PAUL, UNKNOWN OFFICER 1, UNKNOWN OFFICER 2, PARISH OF EAST BATON ROUGE, CITY OF BATON ROUGE)**

127.    The actions and/or inactions of all defendants are violations of the Louisiana Constitution

of 1974 for the following reasons:

Louisiana Constitutional Article I §2 states: "No person shall be deprived of life, liberty, or property, except by due process of law."

In the instant matter, BRPD Officers violated the Plaintiffs' rights when they did all of the acts

complained of herein, which deprived the family of their liberties, without due process of law and

without reasonable suspicion or probable cause to do so.


128.    The actions and/or inactions of all defendants are violations of § 5 of the Louisiana

Constitution of 1974 for the following reasons:

Louisiana Constitutional Article I §5 states: "every person shall be secure in his person, property, communications, houses, papers, and effects against unreasonable searches, seizures, or invasions of privacy. No warrant shall issue without probable cause supported by oath or affirmation, and particularly describing the place to be searched, the persons or things to be seized, and the lawful purpose or reason for the search. Any person adversely affected by a search or seizure conducted in violation of this Section shall have standing to raise its illegality in the appropriate court."

In the instant matter, BRPD Officers violated the Plaintiffs' rights under Section 5 to be free

from unreasonable searches, seizures and invasions of privacy when officer, acting in their

unconstitutional strip and body cavity searches and other U.S and La. State constitutional claims.

## JURY TRIAL DEMAND

**129.** Plaintiffs request a trial by jury.

## PRAYER FOR RELIEF

**130.** The Plaintiffs respectfully request:

    **A.** Compensatory damages as to all Defendants;

    **B.** Special damages as to all Defendants;

    **C.** Punitive damages as to all Defendants sued in their individual capacity;

    **D.** Reasonable attorneys' fees and costs as to all Defendants; and

    **E.** Such other and further relief as may appear just and appropriate.

    **WHEREFORE**, Plaintiffs, Ms. Varnado, T.R., K.E.V., and K.A.V., do pray that after just proceedings are held a judgment is rendered in favor of Plaintiffs and against all Defendants jointly, severally, and/or *in solido* and that said judgment is in excess of five million dollars ($5,000,000) including interest, delay damages, costs of suit, attorneys fees, general and specific damages, punitive and exemplary damages and any other damages as provided by law.

Respectfully submitted,

/s/ Ryan K. Thompson

**Ryan K. Thompson, LA Bar #38957**
**TRIAL ATTORNEY**
660 Richland Ave
Baton Rouge, LA 70806
T: (323)271-8032
E: RKTsocialjustice@gmail.com

/s/ Jessica F. Hawkins

**Jessica F. Hawkins, LA Bar #38263**

P.O. Box 5022
Baton Rouge, LA 70802
T: (915)217-9192
E: jessicahawkins0421@gmail.com

**COUNSEL FOR PLAINTIFFS**