**POLICE DEPARTMENT**
**CITY OF BATON ROUGE**

**INTERDEPARTMENTAL CORRESPONDENCE**

DATE:           December 1, 2023

TO:             Ofc. Martele Jackson

FROM:           Chief Murphy Paul

SUBJECT:        Pre-Disciplinary Hearing Notice
                IA File No. 040-23
                75-Day Deadline: December 3, 2023

This letter will advise that I am considering taking official disciplinary action against you for the following reasons set forth below as well as from all information gathered during the Internal Affairs investigation and the Internal Affairs report.

On September 19, 2023, Sgt. Kyle Hill was assigned to investigate claims made by a concerned citizen to Chief Paul. The citizen described an incident that occurred in 2020 in which you witnessed a battery on an arrestee named Charles Brown. According to the citizen, your body camera was taken by then-Lt. Troy Lawrence, Sr.[1], a supervisor on the scene, and another officer who goes by the name "T.T." Chief Paul advised that the citizen did not wish to participate in any criminal or administrative investigations regarding this incident and did not notify you of the conversation with Chief Paul.

Detectives with the Criminal Division conducted an investigation into a BRPD issued body camera that was reported missing on September 27, 2020. On October 20, 2020, you submitted a letter informing your Chain of Command that your body worn camera was lost or missing. You stated in your letter that you placed your body worn camera on the docking station on September 27, 2020, and when you returned to work, your body worn camera was missing from the docking station. You advised that you sent several emails to the Department to locate your body worn camera, but no one responded to your emails or returned your body worn camera.

When interviewed by the Criminal Division, you stated that you witnessed Cpl. Todd Thomas strike Mr. Brown in the head and face four to five times while he was being strip searched in the bathroom of the Street Crimes Processing Facility at First District Precinct. You advised that you and Cpl. Douglas Chutz were inside the bathroom with Mr. Brown. You further advised that he reported his body camera missing after it was taken from him by Cpl. Todd Thomas.

As the detectives continued to investigate these events, they found that officers with the Street Crimes Division were involved in an investigation on September 28, 2020, in which

---

[1] At the time of this IA investigation, Troy Lawrence, Sr.'s rank is Deputy Chief.

4914085

approximately sixteen suspects were arrested for various crimes, including drug and gun possession under BRPD file #20-85635.[2] According to the police reports, Mr. Brown was arrested with 15 other suspects on or near the 3800 block of Chippewa Street on September 28, 2020. Mr. Brown and the other arrestees were transported to First District Precinct (Street Crimes Processing Area) at the completion of the on-scene investigation. You transported Mr. Brown to the District.

Following the Criminal Division's investigation, arrest warrants were issued for Dep. Chief Lawrence (14:134 Malfeasance in Office; 14:24/14:130.1 Principal to Obstruction of Justice; 14:24/14:35 Principal to Simple Battery; and 14:24/14:67 Principal to Theft); Cpl. Chutz (14:134 Malfeasance in Office); Sgt. Jesse Barcelona (14:134 Malfeasance in Office; 14:24/14:130.1 Principal to Obstruction of Justice; and 14:24/14:67 Principal to Theft); and Cpl. Thomas (14:134 Malfeasance in Office; 14:130.1 Obstruction of Justice; 14:35 Simple Battery; and 14:67 Theft) on September 27, 2023.

Cpl. Thomas and Sgt. Barcelona were placed on Paid Administrative Leave effective September 19, 2023. Dep. Chief Lawrence was placed on Paid Administrative Leave effective September 27, 2023. Cpl. Chutz was placed on Paid Administrative Leave effective October 1, 2023.

On October 10, 2023, you were interviewed by Sgt. Hill, after you read your Officer Rights Form and acknowledged that you understood your rights by signing the form. You did not have your attorney or union representative present for the interview. You confirmed that you were on duty on September 28, 2020, and assigned to First District Precinct. You stated that officers with Uniform Patrol were dispatched to a residence at 3866 Chippewa Street, relative to several subjects being seen in the possession of guns. Prior to responding to the area, Sgt. Barcelona (Squad Supervisor) contacted the officers on a talk around channel and advised them to "wait" before responding to the said address because he wanted to make a "few phone calls" prior to them responding to the area.

You stated that the Uniform Patrol officers later arrived at the scene and observed officers with the Street Crimes and Narcotics Divisions present. You further stated that you and other assisting officers began to place the arrestees in the back of their police units. You advised that you placed two of the arrestees in the back of your police unit, with your back seat camera activated, and transported the arrestees to the First District Precinct. After you transported the arrestees, you returned to his normal tour of duty. You stated that you decided to view your rear seat camera video and observed one of the suspects, Mr. Brown, appear to place something in his anus. You immediately called Sgt. Barcelona and told him what you observed on the video. Sgt. Barcelona instructed you to return to the District and advise the officers with the Street Crimes Division.

Upon arrival at the District, you contacted one of the Street Crimes officers, Cpl. Chutz, and informed him of what you observed on his camera. Cpl. Chutz asked you to find Mr. Brown and bring him into the bathroom. You located Mr. Brown and brought him into the bathroom. At the time you entered the bathroom with Mr. Brown, your body camera was in standby mode. You

---

[2] The incident reports for BRPD file 20-00085635 are included in the Internal Affairs file for this matter.

4914085

thought your body camera was supposed to be activated at the time of a strip search, so you pressed the button on your camera to begin recording. You stated that Cpl. Chutz told you to turn your camera off. You advised that you turned your camera off the record setting and left it in standby mode. You stated that Mr. Brown was instructed to remove his clothing, bend over, and spread his butt cheeks.

You advised that Cpl. Chutz pulled his TASER from his holster after Mr. Brown refused to spread his butt cheeks as instructed. You stated that after Cpl. Chutz pulled out his TASER and activated it, Mr. Brown began screaming, which alerted other officers in the area. You advised that Dep. Chief Lawrence entered the bathroom and told Mr. Brown that they had to look in his "ass." You stated that Mr. Brown again squatted towards the bathroom wall and coughed, in the direction away from the officer's view.

You stated that Dep. Chief Lawrence became frustrated and removed his TASER from the holster and activated it, causing your body camera to begin recording. You stated that Mr. Brown began screaming again in fear. By this time, Cpl. Thomas was also in the bathroom. You stated that Dep. Chief Lawrence said, "You see this guy right here, he about to knock the fuck out of you," referring to Cpl. Thomas. Seconds later, Cpl. Thomas struck Mr. Brown in the head and face a few times with a closed fist, causing Mr. Brown to release a bag from his anus that contained suspected Synthetic Marijuana ("Mojo"). You stated that Cpl. Chutz said to Mr. Brown, "You did all of that for some fucking Mojo." Mr. Brown then got dressed, and the officers began to exit the bathroom. You stated that as the officers were walking out of the bathroom, your body camera beeped and you said, "My body camera was rolling." Cpl. Chutz advised you that your body camera may have begun recording at the time Dep. Chief Lawrence's TASER was activated.

You stated that you walked to the desk/radio room of the district and began talking to another officer. Cpl. Thomas walked to the room and asked you to step out and speak to him. Ofc. Jackson reported that Cpl. Thomas told you that he needed to see the video that was captured on your body camera. As you were placing the camera on the docking station so it could download, Cpl. Thomas told you not to put it on the docking station and instead to give it to him. You stated that you gave Cpl. Thomas your body camera, and you and Cpl. Thomas walked outside. You stated that Cpl. Thomas put your body camera next to his cell phone. You stated that you never viewed the video but were present when Cpl. Thomas told Dep. Chief Lawrence that they needed to "get rid" of the video that was captured on his body camera. After viewing the video, Dep. Chief Lawrence stated, "Yea, we got to get rid of it."

Cpl. Thomas put your body camera in the pocket of his cargo pants. You said to him, "Hey, that's my camera." Cpl. Thomas responded, "I know." You stated that by this time you became nervous. You further stated that Dep. Chief Lawrence told you that you had to write a letter concerning the loss of your body camera and if the Department made you pay for the body camera, the "team" would get together and pay for it.

You stated that you contacted Sgt. Barcelona, who appeared to have been informed of the matter. You further stated that you were instructed by Sgt. Barcelona to write a letter regarding the body camera. When you returned to work on October 2, 2020, you sent three emails to the

4914085

Department, asking if anyone had seen your body camera. You stated that after Lt. John Barker learned that you did not have a body camera, he loaned you his camera for a day on October 4, 2023.

You received an email from Sgt. Martha Wilson advising you to come to her office to pick up a loaner camera. You stated that you were later issued a Conference Worksheet by Sgt. Barcelona for the lost/missing body camera. Sgt. Barcelona later wrote the letter regarding the lost/missing body camera to be sent up the Chain of Command, and you signed it. You stated that you did not report any of these events to any other superior officer on your squad or in the Department.

You stated that texted Dep. Chief Lawrence the next day and then called him to speak to him regarding everything that took place. You asked Dep. Chief Lawrence if he was about to be Deputy Chief. Dep. Chief Lawrence replied, "Yes, why you trying to move somewhere?" You advised that you would be interested in transferring to the Traffic Division. You explained that you participated in the assessment for the Traffic Division but did "poorly." You stated that Dep. Chief Lawrence told you that that he could get you into Fifth District, but you were never transferred. You stated that you took Dep. Chief Lawrence's statements about transferring you to a division of your choice as being a way to compensate you for your cooperation in the events involving Mr. Brown.

You stated that you received a telephone call from Chief Paul sometime in August. Chief Paul asked you what happened to your body camera. You stated that you told Chief Paul the truth about the events that occurred on the night in question. You later met with Sgt. Gayton Montgomery and gave him a statement regarding the incident.

On October 17, 2023, Ofc. Jordan Raymond was interviewed by Sgt. Hill, after he read his Witness Officer Form and acknowledged that he understood his rights by signing the form. Ofc. Raymond did not have an attorney or union representative present for the interview. Ofc. Raymond confirmed that he was on duty on September 28, 2020, while working an overtime assignment with the Street Crimes Division. Ofc. Raymond further confirmed that he was dispatched to the 3800 block of Chippewa St, relative to a complaint of subjects walking on the street with guns.

Ofc. Raymond stated that upon his arrival, several subjects were in custody for possession of guns and drugs. Ofc. Raymond further stated that he assisted with placing the suspects in handcuffs and searching the area and suspects for weapons. Ofc. Raymond advised that the suspects were transported to First District Precinct to the processing area used by the Street Crimes Division.

Once he arrived at the processing facility, Ofc. Raymond assisted with processing the evidence that was collected on scene. Ofc. Raymond stated that the processing room was "full" of arrestees and officers involved in this investigation. Ofc. Raymond advised that while he was in the processing area, he heard a loud noise from the bathroom area that got his attention. He stated that he walked toward the bathroom to see what was going on. When he walked into the bathroom, he observed you, Cpl. Thomas, Dep. Chief Lawrence, and Mr. Brown. Ofc. Raymond

4914085

stated that he observed Cpl. Thomas punch Mr. Brown in his face with a closed fist. Ofc. Raymond advised that he did not know why Cpl. Thomas punched Mr. Brown and that he left the bathroom immediately after seeing the punch. Ofc. Raymond stated that he did not have his body camera in his possession when he was in the bathroom.

Ofc. Raymond could not recall whether he saw Mr. Brown or Cpl. Thomas again that night, and stated that he did not observe Cpl. Thomas, or any other officer make physical contact with any other arrestee that night.

On October 19, 2023, Cpl. Thomas was interviewed by Sgt. Hill, after he read his Officer Rights Form and acknowledged that he understood his rights by signing the form. Cpl. Thomas's attorney, John McLindon, was present for the interview. Prior to the interview, Cpl. Thomas and his attorney were given the opportunity to review the documents obtained by Internal Affairs pertaining to this investigation.

Cpl. Thomas confirmed that on September 28, 2020, he was on duty and assigned to the Street Crimes Division. On that day, Cpl. Thomas assisted in the investigation that took place under BRPD File# 20-85635. Cpl. Thomas recalled assisting with processing evidence and strip-searches of arrestees at the First District Precinct (Street Crimes Processing Room). Cpl. Thomas could not recall whether he responded to the scene where the suspects were arrested nor how he was notified about the investigation. Cpl. Thomas could not recall which officers were present when he arrived at the District. He stated that there was a large amount of evidence/property involved with this investigation.

When asked specifically about Mr. Brown's complaint that Cpl. Thomas punched him in the face and head while in the bathroom, Cpl. Thomas stated that several arrestees were strip searched in the bathroom that night and he could not specifically remember Mr. Brown. Cpl. Thomas stated that he did not punch Mr. Brown or any other arrestee that night. Cpl. Thomas further advised that he did not remember Mr. Brown or any other arrestee refusing to show the officers his anus during a strip search. Cpl. Thomas stated that he was not instructed by Dep. Chief Lawrence to strike Mr. Brown.

Cpl. Thomas could not recall being inside the bathroom with you, Cpl. Chutz, or Dep. Chief. Lawrence that night. Cpl. Thomas again advised that several arrestees were searched that night, so he could not remember who was present at the time of each strip search. Cpl. Thomas could not remember if any arrestee was found with illegal drugs in his anus that night.

Cpl. Thomas stated that strip searches are typically done for arrestees with extensive criminal histories and drug related offenses. He advised that during a strip search, the arrestee is instructed to remove his clothing, one piece at a time, until he is completely naked. Cpl. Thomas stated that it is "customary" for the officer's body camera to be off during the strip searches for privacy concerns. Cpl. Thomas could not remember if his body camera was activated at any time on that night. Cpl. Thomas reported that he did not remember seeing any officers remove their TASERS from their holsters or have them in their hands during any of the strip searches that were performed that night. Cpl. Thomas stated that he was not sure if you were present at any time

4914085

during this investigation. Cpl. Thomas did not remember if any officer's body camera was activated during the searches.

Cpl. Thomas explained that he did not observe Cpl. Chutz or Dep. Chief Lawrence hold or remove their TASERS from their holsters during the strip search of Mr. Brown. Cpl. Thomas stated that he did not strike Mr. Brown with a closed fist in the head or face. He advised that he was not instructed to do so by Dep. Chief Lawrence. Cpl. Thomas stated that he did not later learn that your body camera was activated at the time he reportedly struck Mr. Brown. Cpl. Thomas denied taking your body camera to view any video that may have been captured during the strip search of Mr. Brown and denied viewing any video from your body camera. Cpl. Thomas denied transferring any videos from your body camera to his cellphone. Cpl. Thomas further denied placing your body camera in the pocket of his pants and advised that he was not aware that you reported that his body camera was missing.

Cpl. Thomas did not recall contacting Dep. Chief Lawrence and advising him that the video he viewed on your body camera was "bad", and they needed to "get rid of it." Cpl. Thomas did not recall Dep. Chief Lawrence agreeing that the video was bad and that they needed to "get rid of it." Cpl. Thomas also did not recall hearing Dep. Chief Lawrence tell you not to worry about it because he would be a Deputy Chief soon. Further, Cpl. Thomas did not recall Dep. Chief Lawrence tell you that if you had to pay for the body camera, the "team" would put money together.

When asked if he had the ability to transfer videos from a body camera to his cell phone, Cpl. Thomas stated that he has the Axon App on his cell phone, which allows him to transfer video from a body camera to a cell phone. He denied taking your body camera to transfer videos to his cell phone.

When asked if he has spoken to anyone regarding this investigation, besides his legal counsel, Cpl. Thomas advised that his phone has been "ringing nonstop" since the release of the Probable Cause Affidavit and his social security number. Sgt. Hill advised Cpl. Thomas that per Departmental policy he is not to speak on any pending or ongoing Internal Affairs Investigations.

On October 24, 2023, Cpl. Chutz was interviewed by Sgt. Hill, after he read his Officer Rights Form and acknowledged that he understood his rights by signing the form. Cpl. Chutz's attorney, Kyle Kershaw, was present for the interview. Prior to the interview, Cpl. Chutz and his attorney were given the opportunity to review the documents obtained by Internal Affairs pertaining to this investigation.

Cpl. Chutz advised that on September 28, 2020, he was on duty and assigned as a K-9 handler with the Street Crimes Divisions. He confirmed that he assisted with an investigation in the 3800 block of Chippewa Street because the officers requested a "drug dog" to assist in the investigation. Cpl. Chutz stated that at the completion of the investigation on scene, the suspects were transported to First District Precinct for processing.

Cpl. Chutz explained that he assisted with processing evidence, strip searching arrestees, and completed documents at First District Precinct that night. Cpl. Chutz stated that his body

4914085

camera was activated on scene but not in the processing facility. Cpl. Chutz did not recall Mr. Brown as an arrestee that night. Cpl. Chutz could not recall any specific arrestee taken into the bathroom of the processing facility and could not recall going into the bathroom with any arrestee that night.

Cpl. Chutz recalled that the officers involved in the investigation included Dep. Chief Lawrence, Ofc. Joshua Barnett, Cpl. Thomas, Sgt. David Kennedy, the entire Street Crimes Unit, Uniform Patrol Officers (you and Ofc. Raymond) and between four and six FBI Agents.

Cpl. Chutz did not remember Mr. Brown after seeing a picture of him during his interview in the criminal investigation. Cpl. Chutz could not recall Mr. Brown being in the bathroom or being strip searched that night. Cpl. Chutz did not remember being in the bathroom while anyone was strip searched and did not remember being inside of the bathroom, holding his TASER in his hand. Cpl. Chutz could not recall any arrestee refusing to turn or position his body in a manner to where the officers could observe his anus to determine if he was concealing any illegal drugs or contraband.

Cpl. Chutz did not recall being in the bathroom with Dep. Chief Lawrence, Cpl. Thomas, and you. He also could not recall being in the bathroom with Dep. Chief Lawrence, Cpl. Thomas, Ofc. Raymond and you, when Dep. Chief Lawrence stated, "Turn around so we can see you or else he's going to knock the fuck out of you." Further, Cpl. Chutz did not recall seeing Cpl. Thomas strike Mr. Brown several times with a closed fist in his head and face in the bathroom.

Cpl. Chutz stated that his body camera was not activated while he was inside the processing facility or inside the bathroom. He explained that the officers do not activate their cameras while conducting strip searches. Cpl. Chutz did not recall telling you to turn off your body camera once you were inside the bathroom. He advised that because you are in Uniform Patrol, you may not have known that the officers do not record in bathrooms per Departmental policy. Cpl. Chutz further advised that he did not know you.

Cpl. Chutz did not recall unholstering his TASER and activating it because Mr. Brown refused to comply with the instructions that were given to him. Cpl. Chutz did not recall Dep. Chief Lawrence and Cpl. Thomas entering the bathroom after he activated his TASER. He also did not remember hearing Mr. Brown yell loudly when he activated his TASER. Cpl. Chutz did not recall that Dep. Chief Lawrence entered the bathroom to see what was going on, unholster his TASER, and activate it. Cpl. Chutz did not recall Dep. Chief Lawrence stating that he was "pissed off" because Mr. Brown refused to follow the instructions that were given to him. Further, Cpl. Chutz did not recall Mr. Brown yelling after he was struck by Cpl. Thomas. Cpl. Chutz did not recall a small clear baggy of suspected Synthetic Marijuana (Mojo) coming out of Mr. Brown's anus after he was struck by Cpl. Thomas. Finally, Cpl. Chutz did not recall discovering that your body camera was activated after Dep. Chief Lawrence activated his TASER.

On October 24, 2023, Sgt. Barcelona was interviewed by Sgt. Hill, after he read his Officer Rights Form and acknowledged that he understood his rights by signing the form. Sgt. Barcelona's attorney, Kyle Kershaw, was present for the interview. Prior to the interview, Sgt. Barcelona and

4914085

his attorney were given the opportunity to review the documents obtained by Internal Affairs pertaining to this investigation.

Sgt. Barcelona confirmed that he was on duty on September 28, 2020, and was assigned to the Uniform Patrol Division, First District at the time. Sgt. Barcelona stated that on September 28, 2020, he had been in Uniform Patrol for a couple of months after being assigned to the Street Crimes Division for three years. Sgt. Barcelona explained that his squad was dispatched to a call involving several subjects who reportedly were in the street with guns.  Sgt. Barcelona contacted the Street Crimes Division to assist his officers with the call and met with officers from the Street Crimes Division prior to responding to the call.  Sgt. Barcelona stated that when the officers arrived at the scene, several subjects were observed running with guns.

Sgt. Barcelona stated that at the completion of the investigation on scene, he transported one of the arrestees to First District Precinct.  Upon his arrival to the District, he remained at his police unit with the arrestee. Sgt. Barcelona advised that you were assigned to his squad and were present during this investigation. Sgt. Barcelona did not recall you contacting him that day to inform him that you did not have your body camera. Sgt. Barcelona recalled that at a later date, you told him that you docked your body camera on the dock at First District Precinct and when you went to take it off the dock, your camera was gone. Sgt. Barcelona could not recall the date you informed him that your body camera was missing but assumed that it was after this investigation. Sgt. Barcelona stated that he assumed that either he or the other Sergeant instructed you to send an email regarding the missing body camera which was standard protocol. Sgt. Barcelona denied that you told him that you were instructed by Dep. Chief Lawrence to report your body camera as missing. Sgt. Barcelona further denied that you told him any details as to what happened to your body camera.

Sgt. Barcelona advised that if he was instructed to do a Conference Worksheet regarding the missing camera, the decision would have been made by someone in the Mobile Data Division or his superior. Sgt. Barcelona did not recall issuing a Conference Worksheet to you regarding your missing body camera.  Sgt. Barcelona was not aware that Dep. Chief Lawrence told you that if you had to pay for the body camera, the "team" would put money together to take care of the cost.

Sgt. Barcelona explained that at some point when you did not find your missing body camera, he or another supervisor would have had to "figure out the next course of action." In this case, Sgt. Barcelona stated that Sgt. Wilson with Mobile Data requested that the letter be written. Sgt. Barcelona did not recall writing the letter for you but stated that he may have written it. Sgt. Barcelona further stated that if he did write the letter, he would have printed it and put it in your box at the District. If everything in the letter was accurate, you would sign the letter and send it "up the Chain of Command." Sgt. Barcelona advised that if he did write the letter, it was based on the statements that you gave to him. Sgt. Barcelona explained that he would have written the letter if you were was busy and did not have time to complete it.

After reviewing the letter, Sgt. Barcelona stated that he "probably did write this letter." Sgt. Barcelona further stated that he probably "grabbed an old letter head and changed the name

4914085

and narrative." Sgt. Barcelona advised that he did not sign your name at the bottom of the letter. Sgt. Barcelona stated that if he did write the letter, you would have access to it once he completed it but did not recall talking to you about the letter. When asked if he had seen the letter and if he had a copy of the letter in his possession, Sgt. Barcelona did not know if he had a copy of the letter but advised that if he did have a copy of it, it would be on his computer.

When asked by Mr. Kershaw if he had any knowledge about the incidents giving rise to Mr. Brown's complaint, Sgt. Barcelona stated that he did not witness it. Sgt. Barcelona stated that he was at the processing facility on September 28, 2020, while the arrestees were being processed. Sgt. Barcelona denied observing Cpl. Thomas strike Mr. Brown in the bathroom of the processing facility. Sgt. Barcelona further denied seeing you, Dep. Chief Lawrence, Cpl. Chutz, and Cpl. Thomas inside of the bathroom of the processing facility, while Dep. Chief Lawrence and Cpl. Chutz were holding their tasers in their hand. Sgt. Barcelona also denied having any knowledge of the events prior to the criminal and administrative investigations. Sgt. Barcelona advised that he did not hear anything else about your missing body camera and was not contacted by his superiors regarding the missing body camera. Sgt. Barcelona stated again that if he wrote the letter, it was not written on "false pretense" and that he was just assisting his officer who lost his body camera.

On October 31, 2023, Dep. Chief Lawrence was interviewed by Sgt. Hill, after he read his Officer Rights Form and acknowledged that he understood his rights by signing the form. Dep. Chief Lawrence's attorney, Brent Stockstill, was present for the interview. Prior to the interview, Dep. Chief Lawrence and his attorney were given the opportunity to review the documents obtained by Internal Affairs pertaining to this investigation. Dep. Chief Lawrence advised he was placed on Paid Administrative Leave on September 27, 2023, and was informed by Chief Paul that he would be interviewed by the Criminal Division as well as the Internal Affairs Division.

Dep. Chief Lawrence stated that on September 28, 2020, he was on duty and assigned as the Commander of the Street Crimes Division. Dep. Chief Lawrence further stated that he assisted his officers with a criminal investigation that took place in the 3800 block of Chippewa Street. At the completion of that investigation, several suspects were transported to First District Precinct (Street Crimes Processing Facility). Once at the District, Dep. Chief Lawrence assisted his officers with processing and arrest paperwork.  Dep. Chief Lawrence advised that the investigation included officers from the Street Crimes Division, Uniform Patrol, and FBI agents.

Sgt. Hill advised Dep. Chief Lawrence that Mr. Brown stated that on September 28, 2020, he was punched several times in the head and face while in the bathroom of the processing facility. Mr. Brown later identified Cpl. Todd Thomas as the officer that punched him.

Dep. Chief Lawrence confirmed that there are bathrooms in the processing facility and identified the bathrooms in photographs. Dep. Chief Lawrence stated that he does not know Mr. Brown and that he was shown a photograph of Mr. Brown during his interview with the Criminal Division and did not recognize him from his photograph. Dep. Chief Lawrence further stated that he did not witness Cpl. Thomas strike anyone on September 28, 2020. Dep. Chief Lawrence further advised that if Cpl. Thomas did punch Mr. Brown, it would have documented in a Use of Force report and been included in the police report. Dep. Chief Lawrence stated that from Mr. Brown's

4914085

booking photograph, it did not appear that he had been punched in the face and head.

Dep. Chief Lawrence stated that he was sure that the officers conducted strip searches relative to this investigation but did not recall entering the bathroom in the processing area when a suspect was being strip searched to determine if he was hiding illegal drugs in his anus. Dep. Chief Lawrence stated that he would remember if Cpl. Thomas struck an arrestee several times in the face and head inside the bathroom. Dep. Chief Lawrence denied that it happened.

Dep. Chief Lawrence could not recall going into the bathroom when you, Cpl. Chutz and Cpl. Thomas were present. Dep. Chief stated that Cpl. Chutz was present during the investigation because he was assigned to the Street Crimes Division. Dep. Chief Lawrence believed he saw Sgt. Barcelona's name in the police report. He stated that you may have been on scene to help transport the arrestees.

Dep. Chief Lawrence stated that he recognized you because the processing facility was at First District Precinct, where you were assigned. You "stood out" at the processing facility because you wore a "neatly pressed" Class A uniform. Dep. Chief Lawrence further stated that he would talk to you at the District and sometimes when he was off-duty. You asked him how you could get into the Motors Division, and Dep. Chief Lawrence explained the process to you.

Dep. Chief Lawrence did not recall being present when Mr. Brown was strip searched by Cpl. Chutz and you in the bathroom of the processing facility. Dep. Chief Lawrence denied telling Mr. Brown that if he did not comply with the instructions that were given to him, that Cpl. Thomas would "knock the fuck out of him." Dep. Chief Lawrence denied observing Cpl. Thomas punch Mr. Brown in the head and face four to five times after he refused to follow the instructions that were given to him.

Dep. Chief Lawrence did not recall activating his TASER in the bathroom but advised that an audit could answer that question. Dep. Chief Lawrence denied being present in the bathroom when a baggy of suspected Synthetic Marijuana was found in Mr. Brown's anus after he was struck by Cpl. Thomas. Dep. Chief Lawrence further denied being advised by Cpl. Thomas that your body camera may have been activated during the strip search of Mr. Brown. Dep. Chief Lawrence did not remember Cpl. Thomas being in possession of your body camera and transferring videos from that body camera to his cellphone.

Dep. Chief Lawrence did not recall Cpl. Thomas contacting him later that night to tell him that the video of the incident in the bathroom looks "bad." Dep. Chief Lawrence did not recall Cpl. Thomas showing him the video of the incident in the bathroom. Dep. Chief Lawrence denied telling Cpl. Thomas that they had to "get rid of the video." Dep. Chief Lawrence also did not recall instructing Cpl. Thomas to keep your body camera. Dep. Chief Lawrence stated that he has given officers advice in the past as to how to report missing Departmental-issued equipment, but he did not recall talking to you about his missing body camera.

Dep. Chief Lawrence did not recall making contact with Sgt. Barcelona at any time on the night of September 28, 2020. Dep. Chief Lawrence advised that he did not recall telling you that

4914085

if you had to pay for the body camera, the "team" would put money together to pay for it. Dep. Chief Lawrence did not recall telling you to write a letter regarding your missing body camera.

Dep. Chief Lawrence denied telling you that when he was promoted to Deputy Chief, he would transfer you to any division you wanted. Dep. Chief Lawrence advised he did not know that he was going to be promoted to Deputy Chief and that he was not promoted until November 2020.

Dep. Chief Lawrence denied instructing you to write a letter requesting to be transferred to whichever division you wanted to go to and giving you the impression that it would happen. Dep. Chief Lawrence advised that you would have to apply to a division like any other officer. Dep. Chief Lawrence stated that you applied to "a lot" of divisions and was not selected. Dep. Chief Lawrence explained that you applied for the Truce Division and were not selected. However, after a problem with one of the officers that was selected for the Truce Division (Ofc. Raymond Jordan), Chief Paul called Dep. Chief Lawrence and asked him who was selected for the division. Dep. Chief Lawrence informed Chief Paul that Ofc. Curtlan Williams and Ofc. Jesus Urbina had been selected. Chief Paul told him to "stand down" on that decision because he wanted to transfer you to the division as a personal privilege. Chief Paul stated that he "liked this guy." Dep. Chief Lawrence contacted Sgt. Walter Griffin and made the decision to assign Ofc. Urbina to the Street Crimes Division and you to the Truce Division.

When asked if he knew why these accusations were coming out at this time, Dep. Chief Lawrence stated that he did not know where the accusations were coming from. He further stated that you would contact him on a regular basis, which he found "odd" at first, but later thought he was just being nice. Now, looking back on everything, Dep. Chief Lawrence thinks "something is wrong with [you]." Dep. Chief Lawrence did not recall if you contacted him via phone at the completion of the investigation on September 28, 2020.

On November 14, 2023, Sgt. Hill contacted James Manassah, Mr. Brown's attorney, and requested an interview with Mr. Brown. As of November 21, 2023, Mr. Manassah had not responded to Cpl. Hill's request.

On November 15, 2023, Cpl. Logan Collins was interviewed by Sgt. Hill, after he read his Witness Officer Form and acknowledged that he understood his rights by signing the form. Cpl. Collins did not have an attorney or union representative present for the interview. Cpl. Collins advised that on September 28, 2020, he assisted the Street Crimes Division with an investigation under BRPD File# 20-85635. Cpl. Collins stated that he was assigned to the FBI Task Force at the time of this investigation. His office was made aware of the incident on Chippewa Street and agents responded to the scene to assist the BRPD officers with the investigation. At the completion of the on-scene investigation, he and the FBI agents went to First District Precinct (Street Crimes Processing Facility) to further assist with the investigation.

Cpl. Collins stated that he and FBI agents interviewed some of the arrestees at the facility. Cpl. Collins advised that he was never in the bathroom of the processing area, nor was he present while any of the arrestees were being strip searched. Cpl. Collins stated that he was familiar with Mr. Brown by name but did not remember making contact with him on September 28, 2020. Cpl.

4914085

Collins advised that he did not witness Cpl. Thomas or any other officer strike Mr. Brown. Cpl. Collins stated that none of the arrestees he encountered on September 28, 2020 complained to him about being struck by any of the officers that were involved in the investigation.

Cpl. Collins put Sgt. Hill in contact with FBI Agent Jessica Sullivan. Agent Sullivan advised Sgt. Hill that she and four other FBI agents assisted the Street Crimes Division with the criminal investigation on September 28, 2020. Sgt. Hill asked Agent Sulivan if she could arrange interviews with the agents who were present on scene and at the processing facility on September 28, 2020. Agent Sullivan advised Sgt. Hill that she would like to assist him, but she would have to receive permission from Executive Management before the agents could be interviewed. As of November 21, 2023, Sgt. Hill had not heard back from Agent Sullivan or anyone else from the FBI.

On November 15, 2023, Lt. Eric Burkett was interviewed by Sgt. Hill, after he read his Witness Officer Form and acknowledged that he understood his rights by signing the form. Lt. Burkett did not have an attorney or union representative present for the interview. Lt. Burkett stated that he is the Commander of the Tech Unit, where he has been assigned since 2015.

When asked about the camera system in the old Street Crimes Processing Facility located within First District Precinct, Lt. Burkett stated that the camera system inside of the facility is possibly owned and managed by the East Baton Rouge Parish Sheriff's Office. Lt. Burkett stated that BRPD does not have any cameras located inside or outside of that facility.

Lt. Burkett stated that he, along with the Real Time Crime Center, manages the camera systems at the Districts and other BRPD facilities. Lt. Burkett stated that he and the Real Time Crime Unit hold the administrative rights to the cameras for the Districts as well as the new Street Crimes processing facility (Old Narcotics Processing Bay Area).

Lt. Burkett stated that on June 13, 2023, a technician from Site Safe Security contacted him from the Narcotics processing facility. The technician asked him for the password for the DVR system at the facility. Lt. Burkett stated that the technician told him that Sgt. Barcelona wanted access to the cameras so that the supervisors could manage the cameras from their phones. Lt. Burkett stated that he advised the technician that he would not provide the password for the system and that he would call Sgt. Barcelona regarding his request. Lt. Burkett stated Sgt. Barcelona advised him that he wanted to access the cameras so he could manage the activity at the facility, especially in the case of false alarms. Lt. Burkett stated that he advised Sgt. Barcelona that he could install the software on Sgt. Barcelona's computer. Sgt. Barcelona never brought his computer to the Tech Unit, so the software was not installed.

Sgt. Hill noted in his report that the arrest report pertaining to the September 28, 2020, investigation shows that the subjects were arrested at 7:00 p.m. Based on the statements provided by the officers involved in the investigation, Sgt. Hill concluded that the arrest paperwork and processing of the weapons and drugs collected on scene took the officers several hours to complete. Sgt. Hill was not able to obtain video surveillance from the processing facility from September 28, 2020.

4914085

At Chief Paul's request, Axon Enterprise, Inc. ("Axon") performed user and device audits for September 28, 2020. The full report and audit trails from Axon is included in the Internal Affairs file for this matter.

A user audit trail created for Cpl. Thomas indicates that on September 28, 2020, Cpl. Thomas logged into Axon Evidence via a Chrome Browser on a computer at 16:00:06 EDT and logged into the Axon View app for Android 10 on a Samsung SM-G960U (Galaxy 9) device at 17:33:25 EDT and at 21:48:05 EDT. The User Audit Trail does not have records of specific activity conducted within the mobile app. Therefore, it cannot be determined what activity occurred or for how long it was conducted.

A user audit trail created for Sgt. Barcelona indicates that Sgt. Barcelona did not log into Axon Evidence or Axon View on September 28, 2020. Two evidence files were uploaded that day but were automatic uploads that did not require a log in.

A user audit trail created for Dep. Chief Lawrence indicates that Dep. Chief Lawrence did not log into Axon Evidence or Axon View on September 28, 2020.

A user audit trail created for you indicates that you logged into Axon Evidence via Chrome browser on September 28, 2020, at 12:50:26 EDT. You did not log into Axon View at any time that day.

A device audit trail for the TASER X2 energy weapon with serial number X29005YWE assigned to Dep. Chief Lawrence indicates that it was armed on September 28, 2020, at 21:37:33 CDT for a duration of two seconds. The armed event resulted in the SPPM broadcasting a wireless signal for 30 seconds which recorded the SPPM's end of transmission. This signal would have activated any Axon body worn camera in the vicinity that received the signal and was configured to activate.

A device audit trail for the TASER X2 energy weapon with serial number X29003MNW assigned to Cpl. Chutz indicates that it was armed twice on September 28, 2020, at 21:33:25 CDT for 32 seconds and 21:34:47 CDT for 17 seconds. The recorded events do not include entries from an SPPM activation, so there was no wireless signal transmission associated with these armed events.

The device audit trail for the Axon Body 3 BWC with serial number X6030172C assigned to you reported that on September 28, 2020, at 21:36:43 EDT a "TASER Weapon Armed notification was sent to Axon Evidence." This entry is made when the Axon Body 3 BWC receives a signal from a TASER energy weapon and sends the notification to Axon Evidence via its LTE signal. There are no further entries in the device audit trail, which is consistent with it not being docked and uploaded after the incident.

The report noted that because the Axon Body 3 BWC and TASER energy weapons run on independent free-running clocks, it is expected that their logged timestamps may be misaligned

4914085

due to clock drift.

## VIOLATIONS OF DEPARTMENT POLICY

Your actions described above, specifically, giving your body worn camera to Cpl. Thomas, falsely reporting your body worn camera as lost or missing, and not reporting that Cpl. Thomas took possession of your body worn camera, may be contrary to this Department's Policy and Procedure Manual, specifically:

### GENERAL ORDER NO. 112: SUBJECT – DISCIPLINE

### XIII.  Disciplinary Articles

The following articles of discipline are intended to be used as citations of misconduct or a failure to comply with policy, procedure, or Departmental regulations.

\*        \*        \*        \*

### 2:7    Damaging Departmental Equipment

No member of the Department shall willfully or through neglect or failure to act, abuse, damage, lose or cause to be soiled or wrongfully dispose of any property or equipment of the Department. If departmental issued equipment is/are damaged, lost, soiled, or stolen as the result of an act(s) of willful neglect or abuse, the employee shall reimburse the BRPD for the replacement cost of the equipment.

\*        \*        \*        \*

### 2:11    Conduct Unbecoming of an Officer

Every member of the Department, whether no or off duty, in an official or unofficial capacity, must conduct himself at all times in such a manner as to set a good example for all others with whom he may come in contact. He shall in no way, through actions or neglect, bring dishonor or disgrace upon himself or the Baton Rouge Police Department.

\*        \*        \*        \*

### 3:20    Falsification of Documents

No employee shall willfully falsify any form, report, or document.

\*        \*        \*        \*

4914085

**3:24    Truthfulness**

Every member of the Department is required to be truthful except while conducting investigations that require surreptitiousness.

## STATE CIVIL SERVICE LAW

Your conduct also constitutes reason for which disciplinary action may be taken under the provisions of La. R.S. 33:2500(A), which states:

The tenure of persons who have been regularly and permanently inducted into positions of the classified service shall be during good behavior. However, the appointing authority may remove any employee from the service, or take such disciplinary action as the circumstances warrant in the manner provided below for any one of the following reasons:

☒    (1)  Unwillingness or failure to perform the duties of his position in a satisfactory manner.

☒    (2)  The deliberate omission of any act that it was his duty to perform.

☒    (3)  The commission or omission of any act to the prejudice of the departmental service or contrary to the public interest or policy.

☐    (4)  Insubordination.

☒    (5)  Conduct of a discourteous or wantonly offensive nature toward the public, any municipal officer or employee; and, any dishonest, disgraceful, or immoral conduct.

☐    (6)  Drinking vinous or spirituous liquors while on duty or reporting for duty while under the influence of liquor.

☐    (7)  The use of intoxicating liquors, or habit-forming drug, liquid, or preparation to an extent which precludes the employee from performing the duties of his position in a safe or satisfactory manner.

☐    (8)  The conviction of a felony.

☐    (9)  Falsely making a statement of any material fact in his application for admission to any test for securing eligibility or appointment to any position in the classified service, or, practicing or attempting to practice fraud or deception in any test.

☐    (10) Using or promising to use his influence or official authority to secure any appointment to a position within the classified service as a reward or return for partisan or political services.

☐    (11) Soliciting or receiving any money or valuable thing from any person for any political party or political purpose.

☐    (12) Inducing or attempting to induce by threats of coercion, any person holding a position in the classified service to resign his position, take a leave of absence from his duties, or waive any of his rights under the provisions of this Part, or of the rules.

Page **15** of **16**
(Ofc. Martele Jackson #040-23)

4914085

☐      (13) The development of any defect of physical condition which precludes the employee from properly performing the duties of his position, or the development of any physical condition that may endanger the health or lives of fellow employees.

☒      (14) The willful violation of any provision of this Part or of any rule, regulation, or order hereunder.

☒      (15) Any other act or failure to act which the board deems sufficient to show the offender to be an unsuitable or unfit person to be employed in the respective service.

### NOTICE OF HEARING

Your conduct may fall below the standard of behavior expected of a Baton Rouge Police Officer. However, before I decide what action is appropriate, you will have a fair opportunity to present your side of this matter to me.

You are hereby notified that you may present yourself at my office at Police Headquarters on the **14th day of December, 2023, at 4:00 P.M.** for a pre-disciplinary hearing. You may bring with you a lawyer, friend or other representative and may present evidence relative to your conduct outlined above, including documents or witnesses to contradict or mitigate the allegations set forth against you in this letter. (**IT IS YOUR RESPONSIBILITY TO NOTIFY AND HAVE PRESENT ANYONE YOU CHOOSE TO BRING WITH YOU INCLUDING A LAWYER, FRIENDS, WITNESSES OR OTHER REPRESENTATIVES, AND TO HAVE WITH YOU ANY DOCUMENTS YOU WOULD LIKE TO HAVE REVIEWED**). I will deem other issues not relevant and will not consider them.

To establish your receipt of this letter you are directed to sign and date it in the space below.

You shall give notice of your intention to appear or not to appear in writing by your representative or the chain of command to the Chief of Police within ten (10) days of the receipt of this notice. If you should choose not to appear, a decision on disciplinary action, up to and including termination, will still be made based upon the information made available to me. You would then be notified in writing as to any disciplinary action taken, up to and including termination, and you also would then be afforded all appeal rights under the provisions of the Louisiana Municipal Fire and Police Civil Service law.

_Murphy 1. Paul_     12/01/2023
Murphy Paul            Date
*Chief of Police*

_____
Ofc. Martele Jackson      Date

Page **16** of **16**
(Ofc. Martele Jackson #040-23)

4914085